## COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                      SUPERIOR COURT DEPARTMENT
                                                  OF THE TRIAL COURT
                                                  Civil Action No.

| | |
|---|---|
| Quality Beverages Limited Partnership | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| Teamsters Local Union Local 170, International | ) |
| Brotherhood of Teamsters, | ) |
|     Defendant | ) |

## APPLICATION FOR VACATION OR MODIFICATION OF ARBITRATOR'S AWARD

1.      Pursuant to G.L. c. 150C, §11, the Plaintiff Quality Beverages Limited Partnership

hereby requests this Court to vacate an award and decision of an arbitrator dated September 1,

2020, and received by Plaintiff's counsel on that same date. In the alternative, pursuant to G.L. c.

150C, §12, Plaintiff respectfully requests this Court modify said award so as to be consistent with

the parties' collective bargaining agreement and principles of just cause. The award and decision

is attached hereto and incorporated herein by reference as Plaintiff's Exhibit 1.

2.      Plaintiff is a Massachusetts corporation with a regular place of business in

Taunton, County of Bristol, Commonwealth of Massachusetts.

3.      Defendant Teamsters Local 170 ("Local 170" or "Union") is a voluntary,

unincorporated association whose office and place of business is in Worcester, in the County of

Worcester, Massachusetts. Local 170 is a labor organization within the meaning of §2 (5) of the

Labor-Management Relations Act of 1947, as amended, 29 USC §152, which represents certain

–1–

employees of the Plaintiff with respect to their terms and conditions of employment.

      4.      The Plaintiff and Defendant ("Parties") are party to a collective bargaining agreement ("CBA") providing for the arbitration of disputes under that CBA.  On June 17, 2020 and June 30, 2020, the Parties arbitrated the termination of an employee under the auspices of the America Arbitration Association ("AAA") in AAA Case No. 01-19-0004-5995;

      5.      On September 1, 2020, the Arbitrator, Michael W. Metzler, issued his decision and award, attached as Exhibit 1.  Arbitrator Metzler found that there was no just cause for the termination of the employee, and ordered a make whole remedy including reinstatement and back pay.

      6.      Consequently, in support of its Application, pursuant to G.L. c. 150C, §§11 and 12, Plaintiff states as follows:

            a.      the Arbitrator exceeded his powers by making an award contrary to applicable and controlling law and the collective bargaining agreement between the parties;

            b.      the Arbitrator did not draw his award from the essence of the collective bargaining agreement between the parties and dispensed his own brand of industrial justice;

            c.      the Arbitrator's rulings in relation to the taking and consideration of evidence unfairly prejudiced the Plaintiff in contravention of G.L. c. 150C, § 5.

            d.      The Arbitrator failed to consider or impose any other penalty for the conduct which he found.

**WHEREFOR**E, Plaintiff respectfully requests this Court to VACATE and/or

MODIFY the arbitrator's award.

Dated:          September 21, 2020

Respectfully submitted,
Quality Beverages Limited Partnership
By its attorneys,

Arthur Murphy, BBO # 362020
Kier Wachterhauser, BBO #681772
Murphy, Hesse, Toomey & Lehane, L.L.P.
300 Crown Colony Drive, Suite 410
Quincy, MA 02169
(617) 479-5000

# EXHIBIT 1

# American Arbitration Association

## TEAMSTER UNION LOCAL 170

-and-

## QUALITY BEVERAGES LIMITED PARTNERSHIP

## CASE NO. 01-19-0004-5995

-------------------------------------------------------------------------------------

# AWARD

The undersigned Arbitrator, having been designated in accordance with the Collective Bargaining Agreement entered into by the above-named Parties, and having heard the facts and arguments of the Parties, awards as follows:

The Company did not have just cause to terminate Ben Seaman. Mr. Seaman is to be reinstated to his prior employment with his appropriate level of seniority. He is to be made whole for lost earnings to be calculated as what he would have earned if not terminated, minus any interim earnings and government entitlements which would have not taken place had he not been terminated. He is also to be made whole for any benefits lost.

The Arbitrator will retain jurisdiction on this case through October 2, 2020 to resolve any issues on the application of this Award.

*Michael W. Metzler*

Date:  September 1, 2020

Michael W. Metzler, Arbitrator

## American Arbitration Association

```
**********************************************
In the matter of the arbitration between:          *
                                                   *
                                                   *
TEAMSTERS UNION LOCAL 170                           *
                                                   *   AAA #
                                                   *   01-19-0004-5995
            -and-                                  *
                                                   *
QUALITY BEVERAGES LIMITED PARTNERSHIP.             *
                                                   *
                                                   *
                                                   *
                                                   *
                                                   *
**********************************************
```

### INTRODUCTION

A demand for arbitration was filed by Local 170 of the Teamsters Union (the "Union"), pursuant to the Parties' 2017-2022 Collective Bargaining Agreement (the "Agreement," Joint Ex. 1) and in accordance with the procedures established by the American Arbitration Association. The Parties jointly selected Michael W. Metzler to act as single neutral arbitrator in the matter. A virtual hearing on the Zoom platform was held on June 17, 2020. A second day of hearing was also conducted on the Zoom platform on June 30, 2020.

Sean Foley, Business Agent, Teamsters Local 170, represented the Union. Testifying for the Union was Ben Seaman (the "Grievant").

2

Quality Beverages Limited Partnership (the "Company") was represented by Attorney Arthur P. Murphy of Murphy, Hesse, Toomey & Lehane, LLP. Testifying for the Company were Anthony Osimo, Director of Operations from 2018 to 2020, and Stephen Doherty, Vice President of Sales. Written briefs were submitted by both Parties and received by the Arbitrator on August 3, 2020.

## THE ISSUE

The Parties agreed to the following statement of the issue:

Did the Company have just cause to terminate the Grievant? If not, what shall the remedy be?

## RELEVANT CONTRACT PROVISIONS

The Parties' 2017-2022 Collective Bargaining Agreement (Joint Exhibit 1) was confirmed by the Parties to be the Agreement in effect at the time of both the grievance and this hearing. It contains the following pertinent provisions:

ARTICLE 2   EMPLOYEES COVERED

**2.1**     The Company Recognizes the Union as the sole and exclusive bargaining agent for all its warehouse employees, helpers, floormen and stockmen, fork truck operators, checkers and drivers, and in a separate classification all full-time and regular part-time can operators but excluding clerical employees and supervisory personal with respect to wages, hours and other conditions of work.

ARTICLE 3 MANAGEMENT RIGHTS

**3.1** The Employer reserves all traditional management rights except to the extent that such rights may be modified or restricted by the specific terms of this Agreement. The management of the business and the direction of the work force, including but not limited to the right to plan, direct, and control all operations or services to be performed by employees, to schedule working hours, to hire, promote, demote, and transfer, to suspend, discipline, or discharge for just cause, to relieve employees because of lack of work or for other legitimate reasons, to make, publish, and enforce reasonable rules and regulations, to introduce new or improved methods, materials, products, or facilities are the exclusive function of management limited only by the express language of this Agreement; provided, however, that such rights shall not be exercised in a manner contrary to or inconsistent with the terms of this Agreement or existing law.

ARTICLE 19  GRIEVANCE AND ARBITRATION

3

**19 .4** Arbitrator's Authority

The arbitrator shall have no authority to add to, subtract from, modify, change, alter, or ignore in any way, the provisions of this Agreement or any expressly written amendment or supplement thereto. The award of the arbitrator so made, shall be final and binding on the parties.

## ARTICLE 21   DISCHARGE & SUSPENSION

**21.1**   The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1) warning notice to the employee, in writing and a copy to the Union, except no warning notice need be given to an employee before he is discharged or suspended for a serious offense.

**21.2**   The following is a non- exclusive list of "serious offenses" which are not limited:

1. Drinking or being under the influence of alcohol.
2. Possession, using, or being under the influence of illegal drugs or controlled substances.
3. Carrying unauthorized passengers.
4. Dishonesty and serious recklessness.
5. Participation of an employee in activity prescribe by the provisions of the no strike/no lockout article of this Agreement.
6. Involvement as a (Company Vehicle Operator) in a preventable traffic accident in which anyone is injured or serious damage results.
7. Conviction including (a plea of no contest) of a felony, or vehicle code violation arising out of the operation of a motor vehicle and/or involving alcohol or drugs.
8. Unauthorized use of Employer's equipment.
9. Making an unauthorized stop or unauthorized deviation from an assigned rout e without compelling justification.
10. Allowing an unauthorized person to board a Company vehicle.
11. Possession of alcohol or drugs (except prescription drugs approved by the Company) on Company time or property including lunchtime.
12. Refusal to submit to a physical examination when ordered to do so, or to submit to a drug and alcohol screen test.
13. Fighting, threatening, intimidating or coercing anyone on Company time or property including conduct towards another based on that person's race, ethnicity, religion, color, disability, national origin, ancestry, age, veteran's status, sexual orientation, sexual abuse of any kind, and the use of profanity in an intimidating or demeaning way against a person, including customers of the employer, while on the Company premises or on duty.
14. Willful Insubordination and derogatory remarks against management or customers.
15. Deliberately damaging, destroying, or defacing property of the Company or that of another employee or that of a customer in the place of business.

4

16. Engaging in any form of employment or self-employment while on leave of absence without prior written approval of the Employer or the Union.
17. Job-related dishonesty.
18. Failure to notify his supervisor immediately should any license be suspended, revoked, denied, or expired, or failure to report any motor vehicle moving violation within thirty (30) calendar days of receipt.
19. Serious at-fault accident
20. Speeding, recklessness or careless use of Company vehicle or equipment.
21. Possession of guns, ammunition, explosives, or other weapons while on duty or on Company property or premises including customer place of business.
22. Refusal to take a drug test as provided in this agreement
23. Failure to report vehicle accident.
24. Punching of another employee's timecard.

## **BACKGROUND**

This case involves an employee of Quality Beverages alleged to be engaged in the unauthorized

sale on October 15, 2019 of a piece of Company equipment, namely a pump jack, sometimes

referred to here as a pallet jack. There are two kinds of jacks used to raise pallets and move them

across a floor. One type is electrical and raises and moves a pallet electronically. The second

type, and the one alleged sold (see picture as ER9), is able to raise and move pallets manually.

Quality Beverages is a wholesaler and distributor of beer brands servicing about 2000 customers

from three locations in Massachusetts and has separate Collective Bargaining Agreements with

Teamsters Local 170 for two of its locations. The Grievant worked at the Company's Taunton,

MA location as a Driver and at times performed work as a Warehouse Worker and as a Driver's

Helper. Teams comprised of a Driver and a Helper are constituted for routes through a daily bid

process according to seniority. On the day of the alleged sale the Grievant was working as a

Helper on the Mansfield /Bellingham run together with Driver Mike Bigelow. The run was

designated as Load #2113 (Stipulated fact of both Parties) and consisted of 15 stops and 1438

cases on vehicle #61 (ER5).

5

On November 19, 2019, Bob Fletcher, another employee of the Company, was delivering

beverages to Denny's Liquors in Bellingham, MA and noticed a pallet jack with markings

identifying it as the property of the Company. He called Company Operations Manager, Doug

Hodgson, who instructed Mr. Fletcher to return the pallet jack to the Company location. He did

so that day. The next day Samir Patel, owner of Denny's Liquors, sent an email (ER4) to Quality

Beverages  claiming the pallet jack had been stolen and stated: "It is not our fault that one of

your drivers sold us the pallet jack."  Mr. Patel, according to his own testimony as a witness at

the arbitration hearing for Mike Bigelow (see partial transcript, U6), as well as the testimony of

Mr. Osimo  at the hearing for the instant case, claimed that he bought the pallet jack from the

Company for $100. This affidavit was signed and sworn a few months later by Mr. Patel (ER12

and U5) and entered here into evidence:

$Co. \quad 12$

TEAMSTERS
LOCAL #170
EXHIBIT #: 5

February 19, 2020

I am Samir Patel, owner of Dennys Liquors , Pulaski Blvd in Bellingham, MA. On
October 15, 2019, I was approached by the Quality Beverage delivery team , and
they told me that the company was getting rid of old equipment, and was I
interested in buying a pallet jack for $100.00. The drivers involved are Mike
Bigelow and Ben Seaman, who I identified from photos I was shown.

I handed Mike Bigelow  $100.00 cash and the pallet jack was left in my store.

 I am signing this statement voluntarily, and it is signed under pains of penalties
of perjury.

Statement given to Stephen Doherty on February 21 , 2020 and witnessed by
Anthony Ossimo.

Samir Patel                    Stephen Doherty                    Anthony Osimo

6

The investigation launched by the Company culminated in the termination of both the Grievant and Mr. Bigelow.

Mr. Anthony Osimo, former Company Director of Operations from 2018-2020. testified on the process of investigation following the email from Mr. Patel.   Mr. Osimo stated that he visited Mr. Patel on November 22, 2019 at the Denny's Liquors location and Mr. Patel said he purchased the pump jack for $100 in cash on October 15, 2019. Mr. Osimo determined from the bid sheet for that day (ER 5) that the delivery team members for Denny's Liquors were the Grievant working as the Helper, and Mike Bigelow working as the Driver. The Company gave Mr. Patel a check for the $100 (ER11) he claimed he paid for the pallet jack.

 Later in the day on November 22, 2019, Mr. Osimo met with the Grievant and Mike Bigelow along with Union member Chad Teixeira and Mr. Hodgson, V.P. of Sales. Mr. Osimo testified that Mr. Bigelow did most of the talking and stated there was no sale of the pump jack, but rather it was left behind. Mr. Bigelow claimed he called someone at Denny's Liquors and said it would be picked up either that day, or the next time a delivery was made to the account. The Grievant was quoted by Mr. Osimo as saying, "Why would we risk our jobs for $100." Both the Grievant and Mr. Bigelow were told at the meeting, and then followed up a letter dated November 22, 2019 (ER18), that they warranted "a suspension pending termination."

A second visit was made to Mr. Patel by Mr. Osimo at which he presented copies of driver licenses for the Grievant ((ER10) and Mr. Bigelow. Mr. Patel confirmed to Mr. Osimo that the Grievant and Mr. Bigelow as the team making the delivery on October 15, 2019 when he (Mr. Patel) purchased the pallet jack. The Union produced a partial transcript (U6) of the arbitration

7

hearing over the issue of Mr. Bigelow's termination which recorded Mr. Patel's account of this

meeting with Mr. Osimo. At that hearing Mr. Foley from Local 170 cross-examined Mr. Patel as

follows:

*Q.*     *Okay. And you talked directly to the driver?*
*A.*     *Correct. Yes.*
*Q.*     *And so when Tony – when Tony came down, he showed you pictures, right? He only*
*showed you pictures of just two different drivers? He didn't show you pictures of a bunch of*
*different drivers.*
*A.*     *Yeah, well, I think only two, but I know right away who it was because I remember it.*
*Q.*     *Okay.*
*A.*     *And I even told Tony the other guy was there, too, but he wasn't involved.*

The Company issued a termination letter (ER19) to the Grievant dated December 2, 2019 and

another letter (U4) with exactly the same wording to Mr. Bigelow. The letter to the Grievant

reads:

*To: Ben Seaman*
*From: Anthony Osimo*
*Re: Termination*
*Date: December 2, 2019*

*This is to advise you that after investigation we have determined that you will be terminated from*
*employment from Quality Beverage Limited Partnership, effective November 25, 2019. The*
*details of the incident are as follows:*
*On October 15, 2019 you signed as helper for Route 2113-"Mansfield/Bellingham." We have*
*been made aware that you sold a piece of equipment, specifically a pump jack, to an account*
*during your workday for a cash amount.*
*There would be no circumstance where you would have the authority to sell any property as*
*owned by Quality Beverage LP. Therefore, selling company assets for personal gain is*
*considered a serious offense under Article 21 of the Collective Bargaining Agreement. This also*
*violates the policies outlined in the Quality Beverage L.P. Handbook, as well as the core*
*company values.*

*Sincerely,*
*QUALITY BEVERAGE LIMITED PARTNERSHIP*
*Anthony R. Osimo*
*Director of Operations*

*CC: S. Foley, B. Paradise, T. Audet, C. Wetterau*

The Union filed a grievance on behalf of the Grievant on December 5, 2019 (U1) with the language: "Violation of article 21 and any and all applicable articles; falsely accused of an alleged incident that occurred October 15th, 2019."

Mr. Osimo also testified on the work record of the Grievant containing several documented disciplinary matters. They were placed in evidence as ER13 through ER17.These take on relevance to the extent the Grievant is found guilty of a dishonest act in this case and the merits of which could bear on the question of whether termination is the just penalty.

The second Witness for the Company was Stephen Doherty, former V.P. of Sales at Quality Beverages and a 34-year employee. Mr. Doherty testified that he prepared a draft affidavit for Mr. Patel's consideration and met with him in February 2020. Mr. Patel made certain edits to the draft and signed the final document (see above, ER12 and U5). In cross-examination Mr. Doherty stated he no longer had the original draft, and he was unable to remember the changes made by Mr. Patel. He did testify that it was "quite possible" Mr. Patel modified the draft to exclude the name of Grievant. In his testimony at the Bigelow arbitration, in answer to the question of what parts he edited, Mr. Patel stated: " Maybe the name, I think, like –yeah, I think they may have had both drivers' name on one of the lines, and I knew it was only one guy involved with the money."

Given his long history with the Company, Mr. Doherty spoke about  the importance of a strict disciplinary policy on dishonesty. He expanded on the vulnerability of the Company with so many employees being unsupervised as they perform their work. He gave examples of past cases where employees were consistently terminated for theft of items of relatively small value.

9

The Grievant was the sole Union witness at the hearing. He denied he had any knowledge there was a sale of a pallet jack when he was the Helper on the delivery to Denny's Liquors on October 15, 2019. According to his testimony, he became aware the pallet jack was missing somewhere along the remainder of the daily run after leaving Denny's. There was both an electric jack and a pump jack loaded by Mr. Bigelow at the start of the run and he observed only the electric jack remained. He said it was not unusual for equipment to be left behind. He stated that Mr. Bigelow said he would call Denny's and say the pallet jack would be picked up that day, or next time Denny's was serviced. The Grievant testified he assumed the pallet jack was retrieved and gave no further thought to it. He explained the Company's practice of the Driver, not the Helper, having full responsibility for all details of the truck and the deliveries, and the Helper taking directions from the Driver. At the meeting with the Company regarding the matter, he confirmed Mr. Osimo's testimony that he (the Grievant) did say, "Why would we risk our jobs for $100?" During his testimony he was asked why he said "we." He answered it was "because we were both accused."

## POSITIONS OF THE PARTIES

### EMPLOYER POSITION

The Company argued there is clear evidence   the Grievant committed a dishonest act. The Driver (Mr. Bigelow) and the Helper (the Grievant) participated together in the alleged sale of the pallet jack to Mr. Patel. Even though Mr. Bigelow allegedly accepted the cash, the Grievant was in the presence of both Mr. Patel and Mr. Bigelow and was fully aware of the transaction. This made him a full participant with Mr. Bigelow in the dishonest act.

The Company placed into evidence Mr. Patel's affidavit (ER12 and U5). The Company drew on the first paragraph to support its position that the Grievant was present and equally involved in the transaction. He did not take the cash in hand as Mr. Bigelow allegedly did, but he was a participant as clearly described in the language. Mr. Patel states, "...I was approached by the Quality Beverage delivery team, and they told me that the company was getting rid of old equipment..." He further stated, "The drivers involved are Mike Bigelow and Ben Seaman...."

The Company also drew attention to a second document to demonstrate participation by the Grievant. This document was placed into evidence by the Union and contains six pages of testimony from the transcript of the arbitration over the Company's discharge of Mr. Bigelow. On p. 208 Mr. Patel testified, "I purchased a pallet jack from Quality because they approach me ...." and he then names both the Grievant and Mr. Bigelow as the individuals who approached him. Further in the transcript the Company in its Post-Hearing Brief refers to Mr. Patel's statement that "And I even told Tony the other guy was there too ...." In his testimony at the hearing Mr. Osimo ("Tony") stated that Mr. Patel told him when they met that the Grievant knew "what was going on" (Arbitrator's notes).

From the foregoing items of evidence, the Company takes issue with the Grievant's credibility in his testimony that he was completely unaware and knew only that the pallet jack was left behind accidentally and would be returned. Other evidence presented was a map of the Mansfield/Bellingham route (ER8) showing that the stops after Denny's Liquors were only a short distance away, and the delivery team could have easily returned quickly to retrieve the pallet jack if it was accidentally left behind. The Grievant claimed in his testimony that Mr.

11

Bigelow said he would call Denny's, yet Mr. Osimo testified a check of the phone records for Mr. Bigelow's Company-issued cell phone showed no such call. In its Post-hearing Brief, the Company states: "The Company had just cause to terminate the Grievant because he participated and was complicit in the unauthorized sale of Company-owned equipment, amounting to theft and dishonesty." The Company argues the Grievant was present and knew about the transaction and is just as dishonest as Mr. Bigelow for not stopping or reporting the transaction. This being the case, the Grievant was not credible in denying his knowledge of the sale.

Having made its argument on evidence the Grievant committed a dishonest offense, the Company argues for "a preponderance of evidence" as the appropriate standard of evidence for review, rather than the standard of "clear and convincing" evidence. The Company contends this case does not contain the elements to apply a standard above "a preponderance of evidence." In its Post-Hearing Brief the Company describes the application of the higher standard as used in other arbitration cases to only apply in situations where "… an employer alleges an employee has engaged in workplace behaviors of theft, dishonesty and violence that would stigmatize an employee to a degree that would substantially diminish the employee's ability to obtain future employment and/or may constitute criminal misconduct." The Company submits that a discharge of the Grievant will not substantially affect his future employability.

Having presented their case that the Grievant committed a dishonest offense, the Company argues there is just cause for termination. It refers to the testimony of Mr. Doherty as to the necessity of a high standard of honestly and truthfulness for its employees, and the historic consistency of discharge as the penalty for employees who violate the standard. Past cases were detailed by Mr. Doherty demonstrating employees have been discharged for dishonest acts

12

involving items of small value. He pointed out the vulnerability of the Company's assets and reputation given many employees working unsupervised out in the field and at their facilities.

The Company points to language in the Agreement which limits the discretion of the Arbitrator in regard to just cause for discharge in cases of dishonesty and theft. Article 21.1 reads: "The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one (1)warning notice to an employee, in writing, and a copy to the Union, except that no warning notice need be given to an employee before he is discharged or suspended for a serious offense." In Article 21.2 there is a list of "serious offenses" and among them are "dishonesty" and "unauthorized use of Company equipment." Under Article 19.4 an arbitrator has "no authority to add to, subtract from, modify, change, or alter or ignore in any way the provisions of this agreement...." The Grievant is accused of dishonest and unauthorized act of selling Company equipment and the Company argues the Arbitrator must uphold the discharge according to the provisions of Article 21.1 in combination with Article 21.2, and in conjunction with the right of the Company to discharge an employee for just cause expressed in Article 3.

Mr. Doherty testified on the number and nature of disciplinary actions taken against the Grievant in his short one-year tenure. In its Post-Hearing Brief, the Company posits the Arbitrator does not have the authority to consider mitigating factors, such as a good work record, because of the limitations contained in Article 19.4, 21.1 and 21.2. After reviewing the Grievant's short work record, the Company claims there is no case for mitigating factors anyway.

At the conclusion of its Post-Hearing Brief, the Company states that the evidence "strongly supports that the Company had just cause to terminate the Grievant." Further, the Company expresses its right to do so as found in the quoted Articles of the Agreement.

## UNION POSITION

The Union argues that the Company failed to meet its burden of proof. It states in its Post-Hearing Brief there is no evidence the Grievant participated in the sale, and, in fact, there is evidence to the contrary. The argument presented by the Union is derived from Mr. Patel's affidavit (ER12 and U5) and the six pages from the transcript of the Bigelow arbitration (U6).

The Union calls attention to Mr. Patel's affidavit (ER12, U5) in which he stated: "I handed Mr. Bigelow $100. and the pallet jack was left in my store." Mr. Doherty testified at the hearing that he drafted an affidavit which he and Mr. Osimo brought to Mr. Patel and Mr. Patel edited it before he affixed his signature. In response to cross-examination, Mr. Doherty stated he did not remember what Mr. Patel edited out, but it could have included Mr. Seaman's name. In the transcript from the Bigelow arbitration( U6), in answer to the question about what he edited out, Mr. Patel testified: " "Maybe the name, I think, like --yeah, I think they had both drivers' name on one of the lines, and I know only one guy was involved with the money."

Earlier in the transcript (U6) there was questioning of Mr. Patel about the visit from Mr. Osimo with pictures of two drivers. The transcript records Mr. Patel testifying in cross-examination that his Assistant got him and said the driver wanted to talk to him. Then being asked if he talked directly to the driver he responded, "Correct. Yes." Shortly after that statement Mr. Patel testified: "And I even told Tony the other guy was there too, but he wasn't involved." [Note:

14

These statements of Mr. Patel were in the context of Mr. Bigelow being identified as giving the cash and Mr. Seaman was the "other guy."]

In its Post-Hearing Brief, the Union makes additional arguments as follows:

1. The Grievant did not receive a fair hearing. The reason given for discharge was the Grievant, " ... sold a piece of equipment, specifically a pump jack, to an account during your workday for a cash amount." After the first meeting with the Grievant, Mr. Osimo learned from Mr. Patel the Grievant was not involved, yet the Company still went ahead with the discharge.

2. The Company did not meet its burden of proof under the standards of "clear and convincing evidence" or "beyond a reasonable doubt." The Union argues that these higher standards are typically required by arbitrators in discharge cases, rather than "a preponderance of evidence." The reason for a higher standard is   the charges here are in the nature of "criminal conduct or stigmatizing behavior" (from Union's Post-Hearing Brief).

3. During the Arbitration hearing, the Company changed the grounds for discharge. In the December 2, 2019 letter of termination (ER19), the reason for termination was selling a piece of equipment and at this Arbitration the Company argued the reason to be participation or presence at the alleged sale by Mr. Bigelow.

## DISCUSSION AND AWARD

The first task as Arbitrator is determining whether there was sufficient evidence of a dishonest act committed by the Grievant. If so, as the agreed-upon Issue indicates, it is then necessary to decide on the appropriate discipline or remedy. The Parties have argued for different standards of

15

evidence to be applied. I will first evaluate the evidence and then discuss what I have determined as the appropriate standard.

A Stipulation agreed-upon by both Parties is as follows: "1. On October 15, 2019, the grievant was the driver helper on load # 2113. 2. Load # 2113 serviced Denny's Liquors in Bellingham on October 15th, 2019." Throughout this hearing and in the Post-Hearing Briefs, there is no dispute over Mr. Patel's credibility that there was at some time a transacted sale of a pallet jack to him. I am not privy to any of the details of the Bigelow arbitration other than the portion of the transcript presented into evidence in this case. The arbitration hearing over the Bigelow discharge preceded this case. It is immaterial here whether Mr. Bigelow was the person who Mr. Patel claimed accepted cash in such a transaction. That was the matter for the Bigelow arbitration. The only relevant discussion here is whether the Grievant carried out, participated in, or was aware of, such a transaction on October 15, 2019 when he and Mr. Bigelow were the team for the delivery to Denny's Liquors.

Two pieces of evidence are key here in determining whether the Grievant committed the alleged offense. The first is the Patel affidavit (U5, ER12) and the second is the transcript (U6). It is interesting that both Parties entered the affidavit into evidence in support of their conflicting positions. In the affidavit the Company draws attention to Mr. Patel's wording that "... I was approached by the Quality Beverages delivery **team,** and **they** told me ..." (emphasis added). Further, "The drivers involved are Mike Bigelow and Ben Seaman ... ." The Union argues against the Grievant's participation with the sentence from the affidavit, "I handed Mike Bigelow $100.00 cash and the pallet jack was left in my store." The Union further argued that Mr. Doherty testified Mr. Patel "possibly" edited out a portion of the first draft because it contained

16

the Grievant's name and in the transcript of the Bigelow arbitration, Mr. Patel testified at the

Bigelow arbitration in reference to the affidavit, " Maybe the name, I think, like –yeah, I think

they may have had both drivers' name on one of the lines, and I knew it was only one guy

involved with the money."

The Company further argued Mr. Patel's participation from the transcript where Mr. Patel states.

is his testimony that "… I purchased a pallet jack from Quality because **they** approach me…."

(emphasis added) Both the Union and the Company refer to the same part of the transcript where

Mr. Patel, in his testimony about Mr. Osimo's visit with the two license photographs, states,

"And I told the other guy was there too, but he wasn't involved." The Company uses this to show

the Grievant participated, and the Union claims this as proof the Grievant "wasn't involved."

Mr. Osimo testified what he heard Mr. Patel say in their two meetings. Mr. Osimo stated that Mr.

Patel said the Grievant was there on October 15, 2019 and the Grievant knew what was going on

in spite of not accepting any cash. Mr. Osimo said it was a "small detail' that the Grievant did

not take the cash and "indistinguishable who is guilty." Mr. Doherty testified about the

possibility of the Grievant's name being edited out for the final version of the affidavit which the

Union drew upon in arguing the Grievant was not involved. The Grievant testified he was not

involved and had no knowledge about any alleged sale being transacted by Mr. Bigelow at the

time of their delivery to Denny's on October 15, 2019.

Mr. Patel was a planned witness for the Company, but he was unable to appear on the first

hearing day. He would have been the final Witness for the Company. The Parties agreed to

continue the hearing on June 30, 2020 so Mr. Patel could be present to testify. He was not

17

present on that day and the hearing was concluded after the Grievant testified. There was no opportunity for examination and cross-examination of Mr. Patel.

The Company argued its case at the hearing and in its Post-Hearing Brief that there is just cause for discharge even if it cannot be shown whether the Grievant carried out, or benefited personally, from the sale of the pallet jack. In the termination notice (ER19) it states, "We have been made aware that you sold a piece of equipment, specifically a pump jack, to an account during your workday for a cash amount." There is a difference between knowledge and directly carrying something out. I must consider whether the evidence points to one or the other and if they call for different remedies. Also, the Union argues against the right of the Company to change the reason at the Arbitration. The Union claims that doing so demonstrates the Company did not conduct a fair investigation by failing to change the reason when the Company learned from Mr. Patel that the Grievant was not involved directly in the actual transaction.

It is undisputed by the Parties that the Grievant did not directly accept cash from Mr. Patel in exchange for a pallet jack. This leaves four possible scenarios for evaluation:

1.  The Grievant was physically close enough to appear to be a partner in the alleged transaction.
2.  The Grievant was not in close physical proximity of the alleged transaction to appear to be a partner in it, but overheard the alleged transaction.
3.  The Grievant did not overhear the alleged transaction but was told about it by Mr. Bigelow during the run on October 15. 2019, or sometime thereafter, by Mr. Bigelow or someone else.

18

4.  The Grievant was in some other location (e.g., outside, in the truck, in another area of the store) and did not hear the alleged transaction taking place and was not told about it by Mr. Bigelow, or anyone else, until the meeting with the Company on November 22, 2019 as he testified.

The Company must first show one of numbers one through three happened and then argue just cause for discharge. It is not the Union's burden to prove number four to be the case, but to challenge the Company's evidence for proof of one of the first three.

Mr. Patel does clearly indicate in his affidavit and in his testimony at the Bigelow arbitration the Grievant was present on the day in question. Further, Mr. Osimo testified Mr. Patel told him the Grievant knew a transaction took place. However, Mr. Osimo did not speak of any details given to him by Mr. Patel on how the Grievant may have known. The Company, from both the affidavit (ER12, U5) and the transcript (u6), points out Mr. Patel's statements about the delivery team approaching him and specifically naming the Grievant and Mr. Bigelow. They offer this as proof of the Grievant's knowledge and complicity However, The Union points out the same documents contain Mr. Patel's statements that the Grievant was not involved. The Company argues this only means the Grievant was not involved specifically in the exchange of the cash and had little or nothing to say. Conversely, the Union claims this language proves the Grievant was not present at the point of the alleged transaction.

There was no testimony that the Grievant overheard the transaction from some other location within the store or that Mr. Bigelow, or anyone else, told him about it. The Grievant testified he had no knowledge of the alleged transaction until the meeting with Company representatives in November 2019 when he and Mr. Bigelow were suspended pending termination. There were

19

statements in the Company's arguments to the effect that the Grievant "had to know" and Mr.
Osimo testified Mr. Patel told him "the Grievant knew what was going on." (Arbitrator's notes)
There was no evidence presented on how the Grievant might know other than being allegedly
present at the transaction and therefore these statements may only be conjecture because of the
Grievant and Mr. Bigelow were together that day.

This case is lacking direct evidence to satisfy the Company's burden of proof. Mr. Patel was the
only one present to witness the alleged transaction other than the alleged presence, as alleged by
the Company, of the Grievant and Mr. Bigelow. Mr. Patel did not come forward as a Company
witness and his affidavit is tantamount to hearsay. The portion of the transcript from the
Bigelow arbitration mostly describes the sworn testimony of Mr. Patel. This too is akin to
hearsay in its weight as evidence. Mr. Osimo's testimony is hearsay as to what he states was told
to him by Mr. Patel. Arbitrators do allow hearsay evidence but will typically only give it weight
to the extent there is corroborating direct evidence, which is not the situation here.

I do not find it possible to confidently place Mr. Patel's key phrases of the Bigelow transcript
(U6) and affidavit (ER12, U5) in clear context. I cannot be sure what Mr. Patel meant in his
affidavit by stating "I was approached by Quality Beverage delivery **team** and **they** told me that
the company was getting rid of old equipment….". (emphasis added) Mr. Patel accepted this
wording as written by the Company into his affidavit. Did Mr. Patel intend the words to mean
they remained together at the point of the alleged transaction? Or was Mr. Patel speaking in a
general context of making it clear   Quality Beverages sold him the pallet jacket when the named
delivery team was at his store? He had testified, as recorded in the Bigelow transcript, that he at
first did not know who among his vendors sold the pallet jack to him. In the Bigelow transcript

Mr. Patel said his Assistant came to tell him **"the driver"** wanted to speak to him. Did he mean literally the one driver?

Other statements of difficulty in determining context are those about the Grievant's involvement. In the transcript (U6) Mr. Patel states in one place the Grievant was there, but "wasn't involved," and in another he testifies he may have taken the Grievant's name off one line in the affidavit (ER12, U5) because he knew "…only one guy was involved with the money." The Union argues Mr. Patel to mean the Grievant was not in any way involved in the alleged transaction including being present at the point where money was exchanged. However, the Company argues  Mr. Patel was only indicating the Grievant was present during the exchange of cash but was not the one who accepted the cash and had nothing to say.

Clarity is lacking on who was present at the point of the alleged transaction and whether the Grievant had any knowledge of it.  The examples I have given are only meant to be illustrative of the questions which might have been answered through examination and cross-examination of Mr. Patel.

The Company did present other evidence. They introduced a map of the Mansfield/Bellingham run (ER8) to demonstrate the short distance to the stops after Denny's Liquors. It is argued that the delivery team could have easily returned to Denny's that day to retrieve the pallet jack. The map was introduced during the Grievant's testimony to challenge his credibility on his claim the pallet jack was left behind accidentally. The Grievant testified how Mr. Bigelow said he would be calling Denny's to say the pallet jack would be picked up that day or on the next day Denny's received a delivery. The Company argued that, if the Grievant believed the pallet jack was left

21

accidentally, he should have taken the initiative to have the truck return to Denny's that same day. The Grievant testified the Driver has overall responsibility to make such decisions and leaving equipment behind was a common occurrence. I do not feel this argument by the Company evidences the Grievant's knowledge of the alleged pallet jack sale.

I do feel there is merit to the Union's argument that the standard of evidence should be higher than the "a preponderance of evidence." The statement indicating the reason for discharge falls in the categories of theft and dishonesty. Should this record stand, it could have serious consequences for the Grievant's future employability. The appropriate standard of evidence is "clear and convincing." I do not find the evidence to be sufficiently clear and convincing to uphold the Grievant's discharge.  That being said, I believe the evidence also fails on the lower standard of "a preponderance of evidence."

The evidence in this case is limited and subject to conflicting interpretations. The prime evidence is equivalent to hearsay with no corroborating direct evidence. The Company was unable to satisfy its burden that the Grievant committed a dishonest act as he was accused in his termination letter (ER19), or through being aware of a dishonest act that took place on October 15, 2019 when he was a Helper on the delivery to Denny's Liquors.

## AWARD

The Company did not have just cause to terminate Ben Seaman. Mr. Seaman is to be reinstated to his prior employment with his appropriate level of seniority.  He is to be made whole for lost earnings to be calculated as what he would have earned if not terminated, minus any interim earnings and government entitlements which would have not taken place had he not been terminated. He is also to be made whole for any benefits lost.

The Arbitrator will retain jurisdiction on this case through October 2, 2020 to resolve any issues on the application of this Award.